# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

GEORGE R. DILLON,                                   Case No. 1:11-cv-725
    Plaintiff                                   Beckwith, J.
                                                    Litkovitz, M.J.

    vs

COMMISSIONER OF                                     **REPORT AND**
SOCIAL SECURITY,                                    **RECOMMENDATION**
    Defendant

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for disability insurance benefits (DIB). This matter is before the Court on plaintiff's Statement of

Errors (Doc. 11) and the Commissioner's response in opposition (Doc. 14).

## I. Procedural Background

Plaintiff filed an application for DIB in January 2009, alleging disability since January 1,

2007, due to open heart surgery and arthritis. Plaintiff's application was denied initially and

upon reconsideration. Plaintiff, through counsel, requested and was granted a de novo hearing

before administrative law judge (ALJ) Jerry Meade. Plaintiff and a vocational expert (VE)

appeared and testified at the ALJ hearing. On March 14, 2011, the ALJ issued a decision

denying plaintiff's DIB application. Plaintiff's request for review by the Appeals Council was

denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Medical Evidence

Plaintiff initially consulted with cardiovascular specialist Dr. Daniel Snavely, M.D., on November 30, 2005, upon referral from his primary care physician, Dr. John Ellison, D.O., for aortic insufficiency. (Tr. 275-77). Plaintiff reported that normally he was very physically active and went hunting the week of Thanksgiving, but he was unable to go that year due to progressive dyspnea over the preceding two months. Dr. Jeffrey George, M.D., subsequently performed aortic valve replacement and cardiopulmonary bypass surgery in December 2005 due to a history of reduced cardiac functioning and severe aortic insufficiency. (Tr. 286-87).

On January 25, 2006, plaintiff was seen by Dr. Ellison at the Holzer Clinic for a recheck after his heart surgery. (Tr. 295). Dr. Ellison noted that plaintiff was also being followed by Dr. Snavely. Dr. Ellison reported that plaintiff's medication had been altered somewhat post-surgery and that plaintiff was currently feeling well except for continuing to feel a little fatigued from the surgery. Dr. Ellison listed plaintiff's diagnoses as aortic valve disease with aortic valve replacement, hypertension and hyperlipidemia.

Plaintiff presented to the emergency room at the Holzer Medical Center on February 2, 2006, complaining of mild chest pain. (Tr. 215-37). He was placed on continuous cardiac, blood pressure and pulse oximetry monitoring, administered oxygen, and given Ativan. After remaining stable with no further complaints of chest pain or shortness of breath, plaintiff was discharged with a differential diagnosis of chest pain, rule out myocardial infarction; anxiety reaction; and coagulopathy secondary to Coumadin. (Tr. 218).

Plaintiff was seen by Dr. George on February 14, 2006. (Tr. 281). He was having trouble with his hypertension. Dr. George adjusted plaintiff's medications and tried to give him some

reassurance. Dr. George released plaintiff to play golf. (Tr. 283). When plaintiff saw Dr. George on March 14, 2006, plaintiff reported he had a "good golf trip," but he complained of some back pain and shortness of breath. (Tr. 280). Dr. George released plaintiff to his primary care physician and referred plaintiff to a pulmonologist, noting plaintiff did well following surgery and subsequent cardiac test results looked good, but plaintiff had some complaints of shortness of breath, which Dr. George was not sure were of pulmonary etiology. (Tr. 281).

On March 24, 2006, plaintiff was seen by Dr. Ellison for follow-up of his lipids. (Tr. 301). Plaintiff reported that he had been experiencing "a little bit of occasional shortness of breath." (*Id.*). Dr. Ellison diagnosed plaintiff with hyperlipidemia, heterozygous familial hypercholesterolemia, and "nonallopathic" lesions of the cervical and thoracic regions. (*Id.*).

At a November 14, 2006 check-up, plaintiff complained to Dr. Ellison of back, thoracic spine, hip and knee pain. (Tr. 317-18). He complained that the body and back pain was gradually getting worse and was interfering with his activities. He also complained that midback pain was interfering with his job duties. Examination of his midback revealed no tenderness on palpation, no muscle spasm, no costovertebral angle tenderness, and no mass. Dr. Ellison assessed myalgias, essential hypertension, chronic reflux esophagitis, hyperlipidemia, backache, nonallopathic lesions of the cervical region, and aortic valve replacement. An x-ray of plaintiff's thoracic spine taken the next day revealed moderate scattered degenerative changes with spur formation in the dorsal spine, more prominent at the lower dorsal region; no acute bony abnormality; and no malalignment. (Tr. 319).

In December 2006, Dr. Ellison reported that plaintiff's myalgia symptoms had improved. (Tr. 322). Dr. Ellison listed plaintiff's active problems as aortic valve replacement, backache,

chronic esophagitis, congestive heart failure, hypertension, hypercholesterolemia, hyperlipidemia, generalized muscle aches which had suddenly started worsening, and "nonallopathic" lesions of the cervical and thoracic region. (Tr. 322). He diagnosed plaintiff with congestive heart failure; essential hypertension, which was well-controlled; chronic reflux esophagitis; hyperlipidemia, which was improving; backache; and aortic valve replacement.

On January 19, 2007, plaintiff was seen by Dr. William Dennison, M.D., at Huntington Internal Medicine Group. (Tr. 399-400). Dr. Dennison noted plaintiff's history of heart surgery and chronic use of Coumadin. Plaintiff complained of pain in his hands, knees, spine and shoulders. Dr. Dennison reported that lab results were normal. He stated that plaintiff was able to function somewhat and was not interested in surgery at that time. Dr. Dennison observed enlargement of the DIP and PIP finger joints in both hands as well as mild deformities of the knees suggestive of arthritis. Dr. Dennison assessed generalized osteoarthritis, worse at the knees and hands; suspected degenerative disc disease and possibly degenerative arthritis in the spine; and probable chronic rotator cuff disease in the shoulders. Dr. Dennison reported there was "no unifying diagnosis except for 'wearing out.'" (Tr. 399). Dr. Dennison did not believe that it was safe for plaintiff to proceed with many different anti-inflammatory trials, and plaintiff opted to take Lortab as needed for pain. (Tr. 399-400).

On January 24, 2007, plaintiff followed up with Dr. Snavely and Laura Mayer, RN, CNP, regarding valvular heart disease. (Tr. 397-98). Plaintiff reported occasional right-sided chest discomfort which was very random and brief in nature. He reported he had not experienced any shortness of breath. His blood pressure was much less labile than in the past. Plaintiff had not been very active and had gained 17 pounds since his last appointment, which he attributed to his

4

joint complaints, but he indicated he was going to start some exercise routines. Dr. Snavely diagnosed osteoarthritis, status post aortic valve replacement, hypertension, and hyperlipidemia. Plaintiff was to return for follow-up in six months. (Tr. 397-98).

A July 2007 cardiovascular ultrasound revealed normal left ventricular size and function, normally functioning aortic mechanical prosthesis, mild mitral and tricuspid regurgitation and mild left atrial enlargement. (Tr. 395-96).

Plaintiff saw Dr. Snavely for a six-month follow-up in July 2007. (Tr. 393-94). Dr. Snavely reported that plaintiff continued to do well from a cardiac standpoint since his surgery and that his biggest complaint was significant joint disease, for which no effective treatment had yet been found. His blood pressure was well-controlled. Plaintiff denied any chest pain or shortness of breath. Plaintiff reported that he was exercising on a routine basis with no complaints. Plaintiff was asked to return in one year.

On November 5, 2007, plaintiff saw Dr. Snavely and Nurse Mayer for complaints of vision changes. (Tr. 391-92). Dr. Snavely listed plaintiff's diagnoses as questionable TIA (transient ischemic attack) symptoms, dyspnea on exertion likely due to deconditioning and weight gain, hypertension, hyperlipidemia, and status post aortic valve replacement secondary to aortic insufficiency (controlled). (Tr. 392). Dr. Snavely recommended a follow-up carotid duplex ultrasound and suggested that plaintiff see an ophthalmologist.

On April 3, 2008, plaintiff reported to Dr. Ellison that he felt something pop in his back while working out and he could not get up. (Tr. 362-63). He also reported that he was seeing a chiropractor without improvement. Examination of the lumbar region showed tenderness on palpation, and pain was elicited by motion. There was no spasm of the paraspinal muscles. Dr.

5

Ellison assessed lumbosacral disc degeneration. (Tr. 362-63). He ordered physical therapy and pain medication. An x-ray of the lumbar spine revealed small osteophytes at all lumbar levels consistent with degenerative disc disease. (Tr. 364).

On April 24, 2008, plaintiff was seen by Dr. Daniel Black, D.O., at the Holzer Clinic for complaints of low back pain, leg pain, left knee pain, and muscular pain in his shoulders. (Tr. 368-69). Plaintiff reported that for the last couple of weeks prior to his appointment he had experienced low back pain in the central part of his low back with sharpened onset but no radicular symptomatology. He had chronic recurrent mid thoracic pain, which he characterized as "old stuff." (Tr. 368). Plaintiff reported his symptoms were aggravated by standing and he had some referred symptoms down his legs. His back pain diminished with rest. He complained of weakness in the back but no numbness or tingling. He complained of a general decline in his functioning since his heart surgery and further complained of marked fatigue, difficulty sleeping, joint stiffness, and aches and pains. He rated his pain as 8/10 without medication. Plaintiff gave a self-assessment of his functional abilities to Dr. Black, stating that he could stand for up to two hours, sit for up to four hours, walk for up to two miles, and lift over 50 pounds. He reported his activities of daily living were not restricted except by pain. On physical examination, plaintiff exhibited a reduced range of motion in his lumbar spine when side bending and extending to the left, but he had good range of motion in his cervical spine. (Tr. 368). His gait was normal, and he could stand up smoothly. Spasms were noted in plaintiff's cervical and thoracic spines. Dr. Black changed plaintiff's medications and ordered an MRI and x-rays. He opined that plaintiff

may have a "mild meical plical band"[1]; he had distal medial collateral ligament tendonitis; and

his mechanical back pain and thoracic pain were "likely somatic dysfunctions in nature." (Tr.

369). Dr. Black opined: "I wouldn't be surprised if this patient is a post cardiac mild cripple with

some psychodynamic overlays and fears post operatively with the symptomatic findings of his

left biceps reflux diminished in the right biceps strength diminished [sic] must consider a C5-6

central disc or compressive syndrome. . . ." (Id.).

An x-ray of plaintiff's lumbar spine taken that same day showed mild osteoarthritic

changes, including L4-5 facet sclerosis. (Tr. 370). There were no changes compared to April 3,

2008. A left knee x-ray revealed no abnormalities. (Tr. 371). An MRI of the cervical spine

taken on May 6, 2008, revealed a L4-L5, L5-S1 left paracentral disc protrusion. (Tr. 376).

On May 27, 2008, plaintiff complained to Dr. Black of a flare-up of back pain due to

spending eight to ten hours raking hay on a mowing machine. The pain was in the right mid

thoracic area and went into his right leg, neck, and arm. Dr. Black noted that plaintiff's MRI

scan showed some degenerative disc disease, significant spinal stenosis, lateral foraminal

stenosis, and cervical and lumbar facet disease. EMGs completed of his arms the day of the

office visit did not show any obvious radiculopathy. Dr. Black noted that mid back pain was

plaintiff's most problematic area, and he reported that thoracic spine x-rays showed "significant

degenerative disease throughout the discs of the entire spine" with a possible herniated disc at the

thoracic level. (Tr. 378). Dr. Black opted for conservative medical management and prescribed

Lidoderm patches, and he stated he may consider an MRI if this course of treatment was

---

[1]This is an apparent reference to "medial plica syndrome," a condition in which the synovial plicae, which are the inward folds of the synovial lining of the knee joint capsule, become symptomatic and cause knee pain. http://www.ncbi.nlm.nih.gov/pubmed/19344015 (last accessed 11/13/12).

unsuccessful. Dr. Black stated: "Patient is very active and functional. My last note suggested that he may have some 'cardiac cripple.' He is certainly functional on the farm. We will try to get his pain under management and he will continue his independent activity." (*Id*.).

Plaintiff was seen by Dr. Black on July 8, 2008. (Tr. 402-03). He complained of bilateral knee, foot and lumbar and thoracic spine pain that he rated as 5-6/10 without pain medication. He reported that Flector patch samples had not worked. (Tr. 402). An x-ray of the thoracic spine showed degenerative disc disease throughout the thoracic spine with disc space narrowing and hypertrophic end plate change, with the appearance remaining stable since November 14, 2006. Thoracolumbar x-rays showed mild to moderate osteoarthritis. (Tr. 403). Dr. Black noted that plaintiff has not responded to manipulation. Dr. Black recommended conservative care. He noted that plaintiff "felt reasonably functional as long as he took Lortab." (Tr. 403). Dr. Black continued plaintiff's current medication. *Id.*

Plaintiff saw primary care physician Dr. Michael J. Owens, M.D., at the Holzer Clinic to establish care on July 15, 2008. (Tr. 404). Plaintiff complained of osteoarthritic aches and pain at multiple joints that he described as "not worse than before." (*Id*.). Dr. Owens reported that plaintiff was using over-the-counter medication on an as-needed basis with no side effects. He noted that plaintiff had significant arthritis in the knees, foot, and mid to low back. He also reported that plaintiff had worked as a lineman and farmer but was now retired. Plaintiff reported that hydrocone helped his pain. His GERD (gastroesophageal reflux disease) was doing well on the current medications. On the review of systems, it was noted that plaintiff was feeling fine and was not fatigued; he had no neck pain; he had no chest pain or dyspnea; and he had no back pain or arthralgias. Dr. Owens assessed chronic anticoagulant use, aortic valve disorder,

8

essential hypertension, chronic reflux esophagitis and hyperlipidemia. (Tr. 404-07). When Dr. Owens saw plaintiff for follow-up in September 2008, plaintiff reported he was "basically doing well," he had no complaints of fatigue, and his main complaint was his arthritis for which he took Lortab one to two times a day. (Tr. 415-17).

An August 19, 2008 cardiovascular ultrasound/echocardiogram showed normal ventricular size and an ejection fraction of 65%. (Tr. 389-90). Dr. Snavely concluded that there had been no significant change compared to the prior study and that plaintiff had normal left ventricular function; a normally functional aortic mechanical prosthesis; mild tricuspid regurgitation; and mild left atrial enlargement.

In December 2008, Dr. Snavely saw plaintiff for follow-up. (Tr. 385). He found plaintiff was doing well with no chest discomfort or shortness of breath. Plaintiff reported that he had hunted recently and had "no difficulties whatsoever." (*Id.*). However, he did report a tingling and burning sensation in the feet and legs. Dr. Snavely did not change plaintiff's medication and referred plaintiff for evaluation of possible peripheral neuropathy. (Tr. 386).

In April 2009, state agency physician Dr. Diane Manos, M.D., reviewed the file and assessed plaintiff's physical functional capacity. (Tr. 459-66). Dr. Manos opined that plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently; stand/walk for six hours during an eight-hour day; and sit for a total of six hours during an eight-hour day. (Tr. 460). His ability to push/pull was unlimited. (*Id.*). Plaintiff could never climb ladders/ropes/scaffolds, but he could occasionally stoop. (Tr. 461). Dr. Manos also determined that plaintiff must avoid hazards such as machinery and heights. (Tr. 463). In September 2009, state agency physician, Dr. W. Jerry McCloud, M.D., reviewed the file and affirmed Dr. Manos' assessment. (Tr. 506).

9

In October 2010, Nurse Mayer and Dr. Snavely reported that plaintiff had treated with them since November of 2005 for his valvular heart disease and had last been seen in April. They reported that plaintiff's surveillance echocardiograms since the time of his bypass surgery had continued to indicate a normally functioning prosthetic valve with a preserved left ventricular ejection fraction. They opined that from a cardiac standpoint, there was no indication plaintiff was disabled, although they indicated he should not work in jobs where he would be at risk of physical injury due to his chronic Coumadin therapy. (Tr. 539).

Plaintiff received manual traction and spinal chiropractic manipulative treatment from Dr. Nick Robinson, D.C., from November 30, 2010 through January 20, 2011. (Tr. 561-563). Dr. Robinson completed a residual physical functional capacity evaluation in February 2011, in which he found plaintiff could occasionally lift/carry less than 20 pounds and frequently lift/carry less than 10 pounds. Plaintiff could stand/walk less than three hours, he could sit less than two hours, and he must alternate sitting/standing every 30 minutes. His ability to push/pull was limited in the upper and lower extremities. He could never climb ladders/ropes/scaffolds; he could occasionally balance, kneel and crouch; and he could never crawl. He was limited in reaching in all directions and handling but unlimited in fingering and feeling. Dr. Robinson opined that plaintiff became disabled on or before December 31, 2008. (Tr. 560).

Plaintiff treated with family practitioner Dr. Aaron W. Karr, D.O., from March 1, 2010 to March 17, 2011. (Tr. 567-606). Dr. Karr treated plaintiff for a number of conditions, including chronic sinusitis, chronic bronchitis and upper respiratory infection, chronic pain syndrome, neuropathy in the lower extremities, hypertension, deep vein thrombosis, acute gastritis, and lumbar disc displacement. At an April 5, 2010 visit, plaintiff complained of constant pain in his

10

feet and pain in his back that worsened when he bent over. (Tr. 591). It was noted that plaintiff had been working on remodeling his church and had been on his feet "a lot" over the past few weeks. (*Id.*).

On February 21, 2011, Dr. Karr completed a residual physical functional capacity evaluation, wherein he opined that plaintiff could frequently lift/carry less than 10 pounds, stand/walk less than 2 hours, and sit less than 4 hours in an 8-hour workday; he must alternate sitting/standing every 30 minutes; and pushing/pulling was limited in the lower extremities. According to Dr. Karr, plaintiff could never climb ramps/stairs/ladders/ropes/scaffolds; he could never balance, stoop, crouch or crawl; and he could occasionally kneel. Plaintiff was limited in his ability to reach in all directions and to handle. Plaintiff must avoid extreme cold, heat, wetness, humidity, noise, vibration, fumes, odors, hazards, machinery and heights. (Tr. 563).

## III. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

11

2) If the claimant does not have a severe medically determinable physical or mental impairment - *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities - the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2008.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of January 1, 2007 through his date last insured of December 31, 2008 (20 CFR 404.1571 et seq.).

12

3. Through the date last insured, the claimant had the following severe impairments: obesity; generalized arthritis; mild congestive heart disease, status post aortic valve replacement; and degenerative disc disease of the cervical, thoracic, and lumbar spines (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5. After careful consideration of the entire record, the [ALJ] finds that, through the date last insured, the claimant had the residual functional capacity to perform less than a full range of medium work as defined in 20 CFR 404.1567(c). He can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl. He must avoid all exposure to hazards such as moving machinery and unprotected heights and must avoid concentrated exposure to extreme cold, extreme heat, excessive vibration, and irritants such as fumes, odors, dust, gasses, and poorly ventilated areas. He must be allowed to wear corrective lenses at will. The claimant retains the ability to understand, remember, and carry out simple and detailed instructions; to respond appropriately to supervisors, coworkers, and usual work situations; and to deal with changes in a routine work setting.

6. Through the date last insured, the claimant was capable of performing past relevant work as a lawn mower sales associate. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from January 1, 2007, the alleged onset date, through December 31, 2008, the date last insured (20 CFR 404.1520(f)).

(Tr. 14-20).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).

**D. Specific Errors**

On appeal, plaintiff argues that: (1) the ALJ erred in assessing plaintiff's credibility; (2) the ALJ failed in his duty to develop the medical evidence regarding plaintiff's chronic back and spine pain; and (3) the ALJ failed to properly consider whether plaintiff's combined impairments met or equaled the Listings.

**1. The ALJ did not err in assessing plaintiff's credibility**

Plaintiff contends that the ALJ's finding that he was only partially credible is erroneous. (Doc. 11 at 12). Plaintiff argues that the ALJ is not qualified to determine whether his impairments are sufficiently severe to support his complaints, but rather this is a determination that is best left to his treating physicians. (*Id.* at 14). Plaintiff asserts that the ALJ erred by

14

adopting the opinions of state agency reviewing physicians who never examined him and by ignoring the opinions of plaintiff's "credible treating physicians" – Dr. Ellison, who treated plaintiff from January 25, 2006 through May 15, 2008 (Tr. 295-366); Dr. Karr, who treated plaintiff after 2009 and completed a physical RFC assessment in February 2011 (Tr. 563); and chiropractor Dr. Robinson, who treated plaintiff from November 30, 2010 to January 20, 2011 (Tr. 561-62). (*Id.* at 13). Plaintiff contends there is objective evidence of an impairment that could cause debilitating pain and discomfort and that the findings and opinions of the treating physicians, together with the MRIs and other evidence of record, support his physical and mental complaints and show that the ALJ erred in assessing his credibility. (*Id.* at 13-14).

In response, the Commissioner notes that plaintiff does not identify any specific objective evidence that supports his allegations. (Doc. 14 at 6-7). The Commissioner also argues that contrary to plaintiff's position that the ALJ was not qualified to evaluate his credibility, under the law it is the ALJ's sole responsibility to evaluate the claimant's credibility. (*Id.* at 8, citing *Vance v. Commissioner of Social Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008); *Cruse v. Commissioner of Social Sec.*, 502 F.3d 532, 542 (6th Cir. 2007)). In addition, the Commissioner contends that the ALJ reasonably rejected the opinions rendered by Drs. Karr and Robinson because Dr. Karr did not begin treating plaintiff until 2009 and both providers gave their opinions more than two years after the date last insured of December 31, 2008. (*Id.* at 7). Finally, the Commissioner contends that the ALJ properly looked to a number of factors that cast doubt on plaintiff's credibility, including (1) plaintiff's daily activities as reflected in his treating providers' office notes; (2) the treating providers' observations of plaintiff's level of functioning; (3) a lack of objective medical evidence to support the severity of the reported symptoms; (4)

15

inconsistencies between plaintiff's prior statements to his treating providers and his testimony at the administrative hearing; and (5) the fact that plaintiff's conditions responded well to treatment. (*Id.* at 8-10).

In light of the ALJ's opportunity to observe the individual's demeanor at the hearing, the ALJ's credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Kirk v. Sec. of H.H.S.,* 667 F.2d 524, 538 (6th Cir. 1981). "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994). The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.,* 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker,* 732 F.2d 75, 78 (7th Cir. 1984)).

Subjective complaints of "pain or other symptoms shall not alone be conclusive evidence of disability. . . ." 42 U.S.C. § 423(d)(5)(A). Subjective complaints are evaluated under the standard set forth in *Duncan v. Secretary of H.H.S.,* 801 F.2d 847, 852-53 (6th Cir. 1986). In order to find plaintiff disabled on the basis of pain alone, the Commissioner must first determine whether there is objective medical evidence of an underlying medical condition. *Id.* at 853. If there is, the Commissioner must then determine: (1) whether the objective medical evidence confirms the severity of the pain alleged by plaintiff; or (2) whether the underlying medical impairment is severe enough that it can reasonably be expected to produce the allegedly disabling pain. *Id.*

In addition to the objective medical evidence, the Commissioner must consider the opinions and statements of the plaintiff's doctors. *Felisky,* 35 F.3d at 1040. Additional specific

factors relevant to the plaintiff's allegations of pain to be considered include his daily activities; the location, duration, frequency and intensity of his pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication plaintiff takes; treatment other than medication plaintiff has received for relief of his pain; and any measures the plaintiff uses to relieve his pain. *Id.* at 1039-40; 20 C.F.R. § 404.1529(c). Although plaintiff is not required to provide "objective evidence of the pain itself" in order to establish that he is disabled, *Duncan,* 801 F.2d. at 853, statements about his pain or other symptoms are not sufficient to prove his disability. 20 C.F.R. § 404.1529(a). The record must include "medical signs and laboratory findings which show that [plaintiff has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence . . . would lead to a conclusion that [plaintiff is] disabled." *Id.*

Here, the ALJ's credibility determination is supported by the record and is entitled to deference. The ALJ made extensive findings regarding plaintiff's credibility in connection with his determination that plaintiff retained the RFC to perform less than a full range of medium work. (Tr. 17-18). The ALJ thoroughly considered the medical evidence of record and plaintiff's allegations concerning the intensity, persistence and limiting effects of his symptoms, and the ALJ evaluated plaintiff's complaints of pain and symptoms under the two-part *Duncan* standard. (Tr. 17-18). The Court must defer to the ALJ's decision to discount plaintiff's complaints of disabling pain because although there is evidence of an underlying medical impairment, the second prong of the two-part *Duncan* test is not satisfied. Plaintiff's medical records do not contain objective evidence that confirms pain of disabling severity, and there is no

17

medical evidence indicating plaintiff's medical conditions could reasonably be expected to produce pain of disabling severity. *See Duncan*, 801 F.2d at 853-54.

Plaintiff asserts his "file contains an abundance of medical diagnostic tests and other documentation which clearly supports [his] claims of chronic pain and other complaints which resulted in his inability to work." (Doc. 11 at 13). However, he does not point to objective findings in the record that confirm disabling pain or that show his medical impairments are so severe that they could reasonably be expected to produce disabling pain. By contrast, when finding that plaintiff's impairments and pain were not of disabling severity, the ALJ specifically relied on medical records showing that plaintiff was doing well with no chest discomfort or shortness of breath in December 2008 following his heart surgery, which appeared to have been successful (Tr. 18, citing Tr. 385, 390, 393); he had continued normal cardiac functioning (*Id.*, citing Tr. 539); his blood pressure was under good control (*Id.*, citing Tr. 404); and x-rays taken in April 2008 showed no abnormalities in the left knee and only mild degenerative changes in the lumbar spine. (*Id.*, citing Tr. 370-71). The ALJ acknowledged that the medical records included clinical and diagnostic findings of arthritic changes in the spine, shoulder, hands and knees. (*Id.*, citing Tr. 280, 378, 385). However, the ALJ reasonably found these impairments were not of disabling severity given that plaintiff retained the ability to golf, hunt and work on his farm. (*Id.*). The ALJ also took into account the relief plaintiff obtained from medication when finding plaintiff's pain was not of disabling severity, noting that plaintiff reported in July 2008 that morphine reduced his pain levels by half and he felt reasonably functional as long as he took Lortab. (*Id.*, citing Tr. 383).

Plaintiff generally alleges that his own subjective complaints to his treating providers is evidence that he suffered from disabling pain. (Doc. 11 at 13). However, such subjective evidence does not satisfy the two-part *Duncan* test and cannot alone support a finding of disability. *Duncan*, 801 F.2d at 852; 20 C.F.R. § 404.1529(a). Moreover, the ALJ reasonably determined that plaintiff's reports of his activities of daily living and his treating providers' observations were inconsistent with plaintiff's allegations of disabling impairments and pain. (Tr. 18). The ALJ noted that plaintiff reported he went hunting "with no difficulties whatsoever" in December 2008 (Tr. 385); in May 2008, Dr. Black noted plaintiff was very active and functional, particularly on his farm (Tr. 378); plaintiff reported at that same time a flare-up of his back pain after spending eight to ten hours on a mowing machine raking hay (*Id.*); plaintiff reported in September 2008 that he felt fine without complaints of fatigue and he was basically doing well (Tr. 415, 417); and plaintiff reported in April 2008 that he could stand for up to two hours, sit for up to four hours, lift over 50 pounds, and walk up to two miles (Tr. 368). The ALJ reasonably relied on plaintiff's reports of activities that were inconsistent with his allegations of disabling pain to discount plaintiff's credibility. *See Blacha v. Secretary of Health and Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) (in determining credibility, the ALJ may consider the plaintiff's testimony of limitations in light of evidence of the plaintiff's household and social activities); *Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 532 (6th Cir. 1997) (in evaluating the plaintiff's credibility, the ALJ properly took into account the plaintiff's testimony that he could run all of his errands, walk two miles, prepare all of his meals, and drive three times a week).

19

Finally, insofar as plaintiff argues that the ALJ erred by relying on the opinion of the state agency reviewing physician, Dr. Manos, and ignoring the medical opinions rendered by his treating providers in discounting his credibility, the ALJ was not bound to find that plaintiff's impairments were of disabling severity prior to the date last insured based on the treating providers' opinions. Dr. Robinson, plaintiff's chiropractor, and Dr. Karr, plaintiff's treating physician, issued their functional assessments in February 2011, well beyond the date last insured of December 31, 2008. The ALJ found these opinions were entitled to little weight because they were issued more than two years after the date last insured and therefore were not reflective of plaintiff's limitations during the relevant time period. There is no indication in the record that either provider treated plaintiff prior to December 2008 or even knew of the severity of his conditions prior to that date.[2] Thus, the ALJ reasonably decided consistent with the governing regulations to give little weight to these opinions and to instead give great weight to the opinion of the state agency reviewing physician, Dr. Manos, regarding plaintiff's functional limitations. *See* 20 CFR § 404.1527(e)(2)(i) ("administrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence. . . .").

The ALJ thoroughly reviewed the evidence of record and took into account a number of valid factors in discounting plaintiff's credibility. The ALJ's credibility determination is supported by substantial evidence, and the Court has no basis for disturbing the credibility

---

[2]Plaintiff asserts in his Statement of Errors that Drs. Karr, Ellison and Robinson treated him "from 2006 to 2008." (Doc. 11 at 14). The record clearly shows, however, that of these three providers, only Dr. Ellison treated plaintiff during this time period. (Tr. 295-366). In fact, plaintiff specifically asserts elsewhere in his Statement of Errors that Dr. Robinson treated him "from November 30, 2010 through January 20, 2011" (Doc. 11 at 13, citing Tr. 561-62) and that Dr. Karr has treated him "since 2009." (*Id*. at 13).

finding. The medical evidence of record and plaintiff's own description of his activities and functional capabilities support the ALJ's conclusion that plaintiff is able to perform the functions of his past relevant work as a lawn mower sales associate.[3] Plaintiff's first assignment of error should be overruled.

### 2. The ALJ did not fail to develop the medical evidence regarding plaintiff's chronic pain.

Plaintiff alleges as his second assignment of error that the ALJ erred by failing to "fully develop or consider" plaintiff's complaints of cervical, thoracic and lumbar pain which he made to his treating physicians from 2006 through 2010. (Doc. 11 at 15). Plaintiff asserts that the ALJ failed to develop facts regarding his severe and chronic back pain for which he received treatment that included Lortab, morphine patches, and physical manipulation. (*Id.*). Plaintiff contends that the ALJ completely discounted his testimony concerning his pain by devoting only a conclusory statement in the ALJ opinion to plaintiff's complaints of pain: *i.e.*, plaintiff did not exhibit the neurological, manipulative and ambulatory deficits necessary to satisfy the Listings. (*Id.*, citing Tr. 16). Plaintiff's second assignment of error is not well-taken.

Plaintiff, and not the ALJ, bears the burden of providing medical evidence in support of his disability claim. 20 C.F.R. § 404.1512(a), (c). *See Landsaw v. Sec. of HHS*, 803 F.2d 211, 214 (6th Cir. 1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant."). *See also Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008); *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). The record in this case contains numerous

---

[3] The VE testified that plaintiff could perform his past relevant work in this position so long as he was not required to do stocking duties. (Tr. 48-49).

21

medical records from plaintiff's various treating physicians from 2005 to December 31, 2008, the date last insured; medical records and opinions from plaintiff's treating providers after the date last insured until the time of the ALJ hearing; and the April 2009 report of Dr. Manos, a state agency physician, who reviewed the medical evidence and assessed plaintiff's RFC. (Tr. 459-66). The record contained sufficient evidence for the ALJ to fully consider the impact of plaintiff's spinal impairment and corresponding symptoms, including pain, on his ability to function. The ALJ thoroughly reviewed all of the medical evidence, including plaintiff's complaints of arthritic spine pain. (Tr. 16, 18). Plaintiff does not explain how the ALJ erred in this regard and what additional steps the ALJ was obligated to take to develop the record. Moreover, as the Court found in connection with plaintiff's first assignment of error, the ALJ fully considered plaintiff's subjective complaints of pain and functional limitations and gave specific reasons for his determination that plaintiff's statements about the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC for a reduced range of medium level work. Substantial evidence supports the ALJ's determination based on the medical and other evidence of record that plaintiff does not suffer from disabling pain. Plaintiff's second assignment of error should therefore be overruled.

### 3. The ALJ properly considered the combined impact of plaintiff's impairments.

Plaintiff alleges as his third assignment of error that the ALJ failed to consider the combined impact of his impairments and whether his impairments, considered together, equal a listed impairment. (Doc. 11 at 16-17). Plaintiff's argument is not well-taken.

In assessing a claim for disability, the ALJ must analyze "the combined effect of all of the claimant's impairments without regard to whether any such impairment, if considered separately,

22

would be of sufficient severity to render the claimant disabled." *Walker v. Sec. of HHS*, 980 F.2d 1066, 1071 (6th Cir. 1992). This does not mean the ALJ must employ a particular "combined effects" analysis. *See Loy v. Sec. of HHS*, 901 F.2d 1306, 1310 (6th Cir. 1990). "[A]n ALJ's individual discussion of multiple impairments does not imply that he failed to consider the effects of the impairments in combination, where the ALJ specifically refers to a combination of impairments in finding that the plaintiff does not meet the listings." *Id.* (citing Gooch v. Secretary of HHS, 833 F.2d 589, 592 (6th Cir.1987)).

Here, the ALJ determined that plaintiff suffered from the following severe impairments through the date last insured: obesity, generalized arthritis, mild congestive heart disease, status post aortic valve replacement, and degenerative disc disease of the cervical, thoracic, and lumbar spines. (Tr. 14). The ALJ acknowledged that plaintiff also had a history of hypertension and allergies, he had received treatment for some eye issues, he complained of anxiety after his cardiac surgery which had improved over the years, and he testified that he had recently received treatment for Type-II diabetes and a hiatal hernia, but the ALJ found none of these impairments to be severe. (Tr. 14-15). The ALJ thoroughly discussed plaintiff's impairments, both severe and non-severe, and specifically stated that through the date last insured, plaintiff did not have an "impairment or combination of impairments that met or medically equaled one of the listed impairments. . . ." (Tr. 16). The ALJ's statements are sufficient to show that the ALJ considered the combined effect of plaintiff's impairments. *See Gooch*, 833 F.2d at 592 (combination of impairments considered where ALJ decision reflected "consideration of the entire record" and specific findings regarding plaintiff's "impairments"). It is sufficient that the ALJ referred to plaintiff's "impairments" (plural) and "combination of impairments" to show that he considered the combined effect of plaintiff's

impairments. *Loy*, 901 F.2d at 1310. The ALJ's decision amply demonstrates that plaintiff's severe and non-severe impairments were considered collectively. Thus, the ALJ did not err by failing to properly consider the combined impact of plaintiff's impairments. Plaintiff's third assignment of error should be overruled.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date: 11/21/2012

Karen L. Litkovitz
United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

GEORGE R. DILLON,  
    Plaintiff

    vs

COMMISSIONER OF  
SOCIAL SECURITY,  
    Defendant

Case No. 1:11-cv-725  
Beckwith, J.  
Litkovitz, M.J.

### NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).